# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Elsa Zayas | Civil No. _____ |
| Plaintiff, | Plaintiff demands trial by jury |
| v. | RE: Medical Malpractice, Torts |
| Mennonite General Hospital, Inc.;<br>Dr. Rexie Navarro and his conjugal partnership;<br>Dr. Miguel Rodriguez Soberal and his conjugal partnership;<br>Dr. Iván Irizarry and his conjugal partnership;<br>Dr. Pedro Granados and his conjugal partnership;<br>Dr. Freddy Mendez and his conjugal partnership;<br>Sindicato de Aseguradores para la Subscripción Conjunta de Seguros de Responsabilidad Profesional Médico-Hospitalaria ("SIMED");<br>Hospital San Francisco, Inc. (and/or successor-in-interest);<br>Metro Pavía Hospital, Inc.;<br>Metro Pavía Health System, Inc.;<br>Metro Pavía Healthcare Centers, Inc.;<br>Admiral Insurance Company;<br>Doctors' Center Hospital, Inc.;<br>Doctors' Center Hospital – San Juan, Inc.; | |
| Defendants. | |

## C O M P L A I N T

The plaintiff by her undersigned attorneys, as her complaint against the defendants, states, alleges and prays as follows:

### I.    Parties and Persons

1.    Plaintiff Elsa Zayas ("Mrs. Zayas") is a citizen of the United States domiciled in New Jersey. She is the only child of Mr. Gilberto Zayas (deceased) first marriage.

2.    Defendant Mennonite General Hospital, Inc. is a Puerto Rico corporation having its principal place of business in Puerto Rico.

3.    Defendants Dr. Rexie Navarro and his conjugal partnership are domiciled in Puerto Rico.

4.    Defendants Dr. Miguel Rodriguez Soberal and his conjugal partnership are domiciled in Puerto Rico.

5.    Defendants Dr. Iván Irizarry and his conjugal partnership are domiciled in Puerto Rico.

6.    Defendants Dr. Pedro Granados and his conjugal partnership are domiciled in Puerto Rico.

7.    Defendants Dr. Freddy Mendez and his conjugal partnership are domiciled in Puerto Rico.

8.    Defendant Sindicato de Aseguradores para la Subscripción Conjunta de Seguros de Responsabilidad Profesional Médico-Hospitalaria ("SIMED") is a Puerto Rico business entity with its principal place of business in Puerto Rico. It had, at all times relevant herein, issued one or more insurance policies covering some or all of the acts and omissions complained of herein, and is sued under Puerto Rico's direct action statute.

9.    Defendant Hospital San Francisco, Inc. (and/or its successor-in-interest) is or was a Puerto Rico business entity with its principal place of business in Puerto Rico.

10.    Defendants Metro Pavía Hospital, Inc., Metro Pavía Health System, Inc., and/or Metro Pavía Healthcare Centers, Inc. are the successor(s)-in-interest of Hospital

San Francisco, Inc. They are all Puerto Rico business entities with their principal place of business in Puerto Rico.

11. Admiral Insurance Company is a business entity with its corporate registration and principal place of business outside of Puerto Rico or New Jersey. It had, at all times relevant herein, issued one or more insurance policies covering some or all of the acts and omissions complained of herein, and is sued under Puerto Rico's direct action statute.

12. Defendant Doctors' Center Hospital, Inc. is a Puerto Rico business entity with its principal place of business in Puerto Rico.

13. Doctors' Center Hospital – San Juan, Inc. is a Puerto Rico business entity with its principal place of business in Puerto Rico.

14. All corporations and business entities are sued under vicarious liability or as otherwise applicable.

15. No defendant is domiciled in New Jersey.

## II.  Jurisdiction and Venue

16. All above paragraphs are herein incorporated by reference.

17. There is jurisdiction over the subject matter and over the parties to this suit because all of the parties on either side of the suit are of diverse citizenship and because the amount in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars ($75,000). 28 U.S.C. § 1332. Venue is proper in the U.S. District Court for the District of Puerto Rico because it is where a substantial part of the events or omissions giving rise to the claim occurred. 28 U.S.C. § 1391(a).

## III.  General Common Allegations

18. All above paragraphs are herein incorporated by reference.



3

19.     In 2006, Mr. Gilberto Zayas was 74 years old.

### The First Hospital Visit

20.     On January 3, 2006, Mr. Zayas went to the emergency room of Hospital General Menonita / Mennonite General Hospital ("MGH") in Cayey complaining of malaise, fever, chills, dysuria, and productive cough.

21.     He was admitted to MGH by Dr. Rodriguez Soberal with a diagnosis of complicated urinary tract infection and, subsequently, Citrobacter bacteremia was documented.

22.     Mr. Zayas was treated with intravenous Levaquin.

23.     Dr. Rodriguez Soberal requested consults to infectious diseases and urology.

24.     The urologist consulted, Dr. Mendez, never answered the consult.

25.     The infectious diseases physician, Dr. Melendez, did answer the consult, and agreed with the treatment plan that had been established.

26.     Although an infectious diseases follow-up was requested, there is no record of it having been done.

27.     Mr. Zayas improved and was discharged four days later on an oral Levaquin regimen.

### The Second Hospital Visit

28.     On July 21, 2009, Mr. Zayas returned to the MGH emergency room, complaining of left flank and back pain after a fall two days earlier.

29.     Diagnostic tests revealed he suffered from degenerative disc disease, spondylosis at L4 – 5, osteopenia, and mild dextroscoliosis.

30.     He was given Toradol and discharged home.

4

### Urological Treatment

31.     By information and belief, since June of 2010, Mr. Zayas was seeing Dr. Mendez (urologist) for prostate issues.

32.     Mr. Zayas suffered from benign prostate hypertrophy (BPH) with evidence of obstruction of urine flow.

33.     On August 30, 2010, Dr. Mendez decided to try a Flomax trial, but, on May 11, 2011, he documented that Mr. Zayas was not taking his medication.

34.     Dr. Mendez decided to closely follow Mr. Zayas.

### The Third Hospital Visit

35.     On September 19, 2011, the police found Mr. Zayas in his car, disoriented.

36.      Mr. Zayas was taken to the MGH emergency room, and arrived at 11:20 PM.

37.     There, he was evaluated by Dr. Alejandro Marmolejo, who consulted Dr. Rodriguez Soberal.

38.     Dr. Rodriguez Soberal found Mr. Zayas incoherent, weak, and unable to recall recent events.

39.     A physical exam found Mr. Zayas to have poor hygiene.

40.     Dr. Rodriguez Soberal assessed altered mental status (cause to be determined), and admitted Mr. Zayas for evaluation on September 20, 2011.

41.     Dr. Rodriguez Soberal consulted neurology, and requested a head CT scan.

42.     Dr. Vazquez (neurologist) evaluated Mr. Zayas and found him confused with incoherent speech and poor eating habits.

43.     The head CT was normal, although a brain CT described involutional changes not significantly abnormal for the patient's age.

44.     Dr. Vazquez diagnosed dementia (most likely Alzheimer's disease), and recommended treatment with Aricept and Seroquel.

45.     On September 22, Mr. Zayas developed urinary retention and the urologist (Dr. Mendez) was consulted.

46.     Dr. Mendez evaluated the patient the next day at 7:30 AM and found him with altered sensorium and acute urinary retention.

47.     Dr. Mendez placed a urinary foley, and no further recommendations were made.

48.     On September 23, Dr. Rodriguez Soberal ordered a pelvic sonogram which revealed benign prostate hypertrophy.

49.     Several additional tests led to a diagnosis of urinary tract infection, and Mr. Zayas was started on antibiotic treatment with Cipro.

50.     The foley was removed on September 26 in order to assess bladder emptying.

51.     The patient did well, remained afebrile, and was discharged on September 28 to a nursing home.

52.     His final diagnosis was transient ischemic attack, dementia, and urinary retention.

## The Fourth Hospital Visit

53.     On October 17, 2011, Mr. Zayas was taken to the emergency room of Hospital General Menonita in Cidra ("MGH – Cidra") due to weakness, anorexia of four days, and hematuria.

54.     Dr. Pedro Perez evaluated Mr. Zayas.

55.     Mr. Zayas was found dehydrated and with suprapubic tenderness.

56.     He was given a fluid challenge of 500 cc full drip and started on Protonix and Zosyn, an antibiotic.

57.     Mr. Zayas's renal function was compromised.

58.     Mr. Zayas had hyperglycemia, hypernatremia, and hyperkalemia.

59.     Mr. Zayas was diagnosed with complicated urinary tract infection, rule out pyelonephritis.

60.     At 6:00 PM, Mr. Zayas was transferred to the Hospital General Menonita in Aibonito ("MGH - Aibonito") by Dr. Michelle Hoyos for admission and treatment.

61.     Mr. Zayas arrived at MGH – Aibonito at 10:14 PM and was evaluated by a physician at 10:36 PM.

62.     The initial complaint was loss of appetite and problems urinating in the last four days.

63.     A review of systems documented malaise, weakness, dysuria, frequency, hematuria, and pelvic pain.

64.     On physical exam, Mr. Zayas was alert, in no apparent distress, and disoriented times three.

65.     He also had hyperkalemia of 5.6 mmol/L and mild decrease of $CO_2$, as well as altered renal function.

66.     Mr. Zayas's urine was cloudy with proteinuria, pyuria, and hematuria.

67.     Mr. Zayas was admitted, blood cultures were ordered, and he was started on full doses of Zosyn (antibiotic) and Protonix.

68.     On October 18, 2011, Dr. Rexie Navarro evaluated Mr. Zayas.

69.     Dr. Navarro's admission note documented a chief complaint of red blood cells in the urine.

7

70.     Dr. Navarro also noted a history of present illness that included not eating for the last three days, not drinking water for the last days, and chills but no fever.

71.     Dr. Navarro also documented a history of Alzheimer's, recent diagnosis of diabetes, and a recent urinary tract infection.

72.     On physical exam, Dr. Navarro described the patient as alert and hypoactive with dry oral mucosa.

73.     There was no jugular vein distention, the heart had a regular rhythm with no gallop, and the abdomen was soft and depressible with active bowel sounds, and no tenderness.

74.     Mr. Zayas's pulses were weak bilaterally and there was no neurological deficit.

75.     Dr. Navarro's diagnoses were acute exacerbation of chronic renal failure, hyperkalemia, dehydration, dysphagia, hypertension, hyper-glycemia, and partially treated urinary tract infection, rule out bacteremia.

76.     Dr. Navarro ordered urine and blood cultures, hydration with .9 normal saline at 80 cc/hour, input and output, and renal sonogram.

77.     The foley was removed.

78.     Mr. Zayas was started on Rocephin (an antibiotic), kayexalate to treat hyperkalemia, Zoloft, and Pepcid. A blenderized diet was ordered.

79.     On October 19, Dr. Navarro placed phone orders for skin and wound care protocol with placement of Allevyn protectors on heels and sacrum.

80.     Vancomycin was added to treatment of October 21.

81.     Mr. Zayas complained of subprapubic pain and tenderness until October 22.



8

82.     On October 19, a nutritional evaluation was done.

83.     The nutritionist found the patient malnourished, and he was thin and wasted with a low BMI for his age.

84.     The nutritionist made several recommendations, including the addition of supplementation and snacks.

85.     On October 21, Vancocyn was added to the Mr. Zayas's treatment.

86.     Dr. Navarro documented that the patient's leukocytosis had decreased, but he persisted with suprapubic pain.

87.     Leukocytosis, hemoglobin, and hyperglycemia decreased.

88.     Renal function normalized in addition to hypernatremia and hyperkalemia.

89.     The last urine evaluation, on October 24, revealed resolution of pyuria, hematuria, and proteinuria.

90.     Blood and urine cultures were unable to isolate a pathogen.

91.     A renal sonogram reported left hydronephrosis, and a pelvic CT scan described an enlarged prostate causing bladder outlet obstruction.

92.     Thyroid stimulating hormone was low and PSA was elevated.

93.     On October 24, 2011, Mr. Zayas was discharged from the Hospital.

**The Fifth Hospital Visit**

94.     On November 14, 2011, Mr. Zayas was taken to MGH–Cidra's emergency room, complaining of shortness of breath.

95.     Dr. Gladys Vazquez evaluated Mr. Zayas at 11:40 AM.

96.     Dr. Vazquez described Mr. Zayas with regular tachycardia, clear lungs, soft and depressible abdomen with bowel sounds, and normal extremities.



9

97.    The diagnostic impression was dyspnea, suspect sepsis.

98.    Dr. Vazquez ordered a rebreathing mask, hydration with saline, and a fluid challenge.

99.    Cardiac monitoring was ordered, Ancef (an antibiotic) was started, and a workup (including laboratory tests) was done.

100.   Mr. Zayas's urine was cloudy, loaded with white and red blood cells, and there was proteinuria.

101.   An EKG revealed a right bundle branch block with left posterior fascicular block.

102.   A foley catheter was placed at 1:35 PM and Coca Cola-like urine with bloody particles was obtained.

103.   Mr. Zayas was transferred to MGH-Cayey for admission and treatment after he developed tachypnea with decrease in oxygen saturation requiring intubation at 1:40 PM in MGH-Cidra.

104.   Mr. Zayas was admitted at MGH-Cayey with a history of hypo-activity, fever, and purulent secretions from the penis.

105.   There was a history of anorexia, shortness of breath, fatigue, and weakness. This took place during the early morning hours of November 15th while Mr. Zayas was still in the emergency section of the Intensive Care Unit. A nurse with a very heavy cold treated Mr. Zayas without using gloves. Mrs. Zayas complained to the attending physician, to no effect.

106.   He was found somnolent.

107.   There were diagnoses of septic shock and urinary tract infection in a critically ill patient.

10

108.   Mr. Zayas was taken to the intensive care unit and started on Primaxin, a potent antibiotic, and Intropin to raise his blood pressure.

109.   Restraint orders were placed because of violent and self-destructive behavior and this was kept during the entire admission. No pain medication was administered. Mr. Zayas was kept in the same bed position during approximately 2 weeks.

110.   Lovenox, an anticoagulant, was also ordered.

111.   Workup revealed leukocytosis of 20,900 with 89 segmented and four bands, low hemoglobin at 10.9 grams, low platelets at 111,000.

112.   Glucose was elevated, patient had altered renal function and hypernatremia.

113.   Urine was described turbid loaded with white and red blood cells.

114.   Chest X ray reported bilateral pneumonia.

115.   His arterial blood gases revealed metabolic acidosis.

116.   During his hospital stay pneumonia improved.

117.   Blood cultures done on November 14, 2011 isolated Klebsiella pneumonia and Proteus mirabilis.

118.   Klebsiella was again isolated on November 22, 2011.

119.   They were finally negative on November 30, 2011.

120.   Urine culture isolated Klebsiella pneumonia and Enterococcus faecalis.

121.   Klebsiella in urine was again isolated on November 30, 2011.

122.   Leukocytosis remained throughout November, December and most of January of 2012. By January 28, 2012 it had normalized.

123.   Renal function improved and then normalized.

124.   Mr. Zayas persisted with hypernatremia for three weeks.

125.   Hyperkalemia resolved along with acidosis.

126.   Mr. Zayas persisted with pyuria and hematuria, and never resolved during this admission.

127.   A sputum culture was done on December 1, 2011, which isolated Providencia stuartii.

128.   A chest CT had described on November 28, 2011 bilateral lung infiltrates with effusions.

129.   By December 4, 2011, a chest X-ray described right upper and lower lobes densities and on January 1, 2012 it reported clear lungs.

130.   Because of documented severe malnutrition a percutaneous gastrostomy tube (PEG) was placed for hyper-alimentation on November 28, 2011.

131.   The next day, Mr. Zayas was transferred out of the ICU after 2 weeks there.

132.   On December 14, 2011, a urologist was consulted and he recommended transurethral resection of prostate.

133.   Mr. Zayas developed decubitus sacral ulcer.

134.   He had been admitted with no evidence of skin ulcers and by November 23, 2011 a sacral laceration was described.

135.   The lesion worsened to grade 2 on November 29, 2011, and by December 19, 2011 it was upgraded to grade 4.

136.   Because the lesion became infected, Mr. Zayas required surgical debridement on December 19, 2011.

137.   A bone scan revealed osteomyelitis of lumbar spine or upper sacrum, for which 42 days of antibiotics was recommended by infectious diseases.

138.   This was the consequence of active infection at the sacral ulcer.

139.   On November 29, 2011, the patient was transferred to telemetry with a diagnosis of acute respiratory failure, UTI after septic shock.

140.   Mr. Zayas responded to treatment.

141.   On December 26, 2011 the patient pulled off his gastrostomy tube which required replacement at the operating room.

142.   He again pulled if off on January 2, 2012 and was taken to the operating room for the third time to replace it.

143.   During the two and a half months the patient remained hospitalized, he received an array of antibiotics including Primaxin, Amikin, Vancocyn, Cancidas, Polymyxin B, Maxipime and Zyvox.

144.   He required blood transfusions due to his anemia.

145.   The patient's sacral ulcer improved and patient remained stable while on antibiotics.

146.   He was finally discharged from hospital on January 31, 2012 to continue another week of antibiotic treatment.

147.   Pyuria and hematuria continued, but Mr. Zayas's renal function stabilized along with serum electrolytes.

### The Final Year

148.   Once discharged, Mr. Zayas was admitted at Hogar Carmelitano.

149.   He was evaluated by Dr. Pedro Granados who found on, physical exam, that the patient had hematomas of arms, gastrostomy tube, a foley catheter and ulcers on right thigh and sacral area.

150.    On February 10, 2012, a culture of sacral ulcer yielded a multiple drug resistant E. coli and Acinetobacter.

151.    There is no information as to what was done, therapeutically speaking. The sacral ulcer took  approximately 7 to 8 months to heal.

152.    Eight months after, on October 19, 2012, the patient was admitted with urosepsis at San Francisco Hospital.

153.    He presented with hematuria and was hypoactive and anorexic.

154.    Blood cultures were negative and urine culture isolated a multiple drug resistant Proteus mirabilis and Klebsiella pneumoniae.

155.    White blood cells were elevated at 12,900 and urine had pyuria and hematuria.

156.    The patient was started on Polymixin B and Amikin, two potentially toxic antibiotics to kidneys, because of the resistant bacterias.

157.    He completed antibiotic treatment, urine cleared, leukocytosis resolved and patient was discharged on October 28, 2012.

158.    On November 10, 2012, Mr. Zayas was admitted at Doctors' Center Hospital in Santurce with shortness of breath and productive cough.

159.    He was hypoactive and disoriented with a BP at 100/60, HR 126 per minute, RR 30 per minute, afebrile with oxygen saturation at 91%.

160.    The admission diagnosis was pneumonia, sepsis, UTI and congestive heart failure.

161.    The patient was given Rocephin, an antibiotic.

162.    He had leukocytosis of 15,200 with shift to the left, elevated BUN at 36 mg/dl and low $CO_2$ at 19 mmol/L.

163.    Urine had pyuria (WBC 18-20) and hematuria (RBC 24-26).

164.    Blood culture was reported negative and urine culture again isolated Klebsiella pneumonia and Enterococcus faecalis.

165.    Chest X ray described bilateral opacities with pulmonary vascular congestion.

166.    Patient continued antibiotic treatment with Levaquin and Cleocin.

167.    Three days later, chest X-ray revealed resolution of opacities, suggesting the patient had come with pulmonary congestion and not pneumonia.

168.    On November 14, 2012, the patient was described as hypoactive, afebrile with poor oral intake (reason why a PEG was placed the next day).

169.    Mr. Zayas continued with tachycardia and elevated white blood cells (16,500) with a poor prognosis as assessed by physician.

170.    On November 18, 2012, the patient died at 8:27 pm.

## IV.    **Claims**

171.    All above paragraphs are herein incorporated by reference.

172.    Mr. Gilberto Zayas was an elderly male with history of degenerative joint disease, degenerative disc disease, dementia and enlarged prostate. He suffered from multiple episodes of urosepsis secondary to obstructive uropathy secondary to benign prostate hypertrophy (BPH).

173.    The first documented complicated urinary tract infection was diagnosed by Dr. Rodriguez Soberal in 2006. This episode was associated with a serious complication, Citrobacter bacteremia.

15

174.    The patient remained hospitalized four days and was discharged home without repeated blood and urine cultures to assess if bacteria had been eradicated with Levaquin.

175.    The standard of care in management of bacteremia requires repetition of blood cultures to make certain bacteria is no longer in bloodstream.

176.    This is extremely important in the elderly, since in this age group bacteria can persist without the patient manifesting typical signs and symptoms of active infection.

177.    Dr. Rodriguez Soberal failed to request this important workup prior to the patient's discharge.

178.    It is known that urinary tract infections in the male patient occur with more frequency in the elderly and is frequently associated with enlarged prostate which may obstruct urinary tract.

179.    It was important for Mr. Zayas to have evaluation of his urinary tract to determine the cause of urine infection and a serious complication, gram negative bacteremia.

180.    If etiology of urine infection is known, it may be possible to correct cause of infection, decrease or eliminate recurrence rate of infection, reduce admissions to hospital, reduce chances of development of resistance to antibiotics and decrease morbidity and mortality.

181.    Dr. Rodriguez Soberal did correctly place consult to urologist, but he failed to give follow up to this when Dr. Mendez did not evaluate patient as was requested.



16

182.    Dr. Rodriguez Soberal proceeded to discharge the patient and the discharge summary does not indicate patient was advised to see a urologist on an ambulatory basis.

183.    There is evidence that Mr. Zayas was followed by Dr. Freddy Mendez, urologist, since 2010.

184.    On July 21, 2010, a renal sonogram documented moderately enlarged prostate gland suggestive of BPH.

185.    In August of 2010, urine outflow obstruction was diagnosed and a trial with medical treatment using Flomax was initiated.

186.    By May of 2011, Dr. Mendez became aware that Mr. Zayas was not taking his medication and decided to continue "close observation".

187.    There is no evidence of further follow up until the patient was admitted on September 20, 2011 because of disorientation.

188.    Two days after, the patient developed urinary retention.

189.    Dr. Mendez was consulted and proceeded to place a foley.

190.    No further recommendations were made and no mention of patient's condition, BPH, was documented in consult.

191.    Three days after, Dr. Mendez saw Mr. Zayas and removed foley so he could assess bladder emptying. No further follow up was given by Dr. Mendez in this admission.

192.    It was very important to have explained to the primary physician Mr. Zayas's urologic history, BPH, and medical treatment attempt given by Dr. Mendez.

193.    BPH would have explained why the patient had urine retention, a common complication of prostate hypertrophy. Dr. Mendez had been the patient's urologist for

the last year and knew patient was noncompliant with treatment. Having had this new complication and knowing patient's incapacity to cooperate with medical treatment, other options such as surgery needed to be considered at this stage to resolve urinary obstruction and prevent further complications. This was not done.

194.   Two weeks later, the patient is readmitted with hematuria secondary to complicated urinary tract infection (C-UTI).

195.   He had other complications such as dehydration, leukocytosis, electrolyte imbalance, acute renal insufficiency and left hydronephrosis as described in a renal sonogram done.

196.   Again, prostate enlargement was described.

197.   On this admission, Mr. Zayas had a different internist, Dr. Rexie Navarro.

198.   He evaluated and admitted the patient.

199.   Obstructive uropathy had worsened with the evidence of hydro-nephrosis and compromised renal function.

200.   Surprisingly enough, an urologist was not consulted on this admission and patient was discharged after completing antibiotic treatment.

201.   It would have been of great importance to have a urologist evaluate the patient and take measures in resolving obstruction, decrease chances of further renal impairment and repeated episodes of infection as was seen in this case.

202.   Dr. Navarro failed to follow standard of care in the management of urinary tract infection secondary to urinary tract obstruction by consulting case with urologist and insisting on correction of obstruction.

203.   This would have been the perfect setting for managing Mr. Zayas's medical problems, since the patient was in the hospital, allowing close follow up, intravenous antibiotic treatment with urine sterilization in an obstructed urinary tract.

204.   The likelihood of intraoperative and post-operative complications would have been reduced and should they have happened, the patient was still in the hospital for proper management.

205.   Two days after discharge from hospital, Mr. Zayas visited Dr. Mendez at his office.

206.   Dr. Mendez stated patient had a foley due to urinary retention and he proceeded to remove it.

207.   He decided it was time to perform surgery and scheduled patient for TUR-P on November 15, 2011.

208.   Mr. Zayas failed to do preadmission.

209.   This led to his next admission on November 14, 2011, when he was found with severe manifestations of urosepsis.

210.   He was in septic shock and was also found with bilateral pneumonia.

211.   Blood and urine cultures isolated Klebsiella pneumonia among other pathogens.

212.   This bacteria persisted in Mr. Zayas's urinary tract until his death one year later.

213.   Dr. Mendez was consulted one month after Mr. Zayas's third admission, on December 14, 2011.

214.   Dr. Mendez recommended to keep the foley in place until the patient was stable enough to have surgery.



19

215.   The patient remained hospitalized until January 31, 2012, and there is no evidence of urologic follow-ups or attempts to schedule patient for TUR-P.

216.   If there were contraindications for surgery, these were not documented in progress notes.

217.   After discharge, there is no evidence in medical records providing that Mr. Zayas was followed up by Dr. Mendez or any other urologist until his death.

218.   It is most likely that Mr. Zayas's multiple urosepsis events could have been prevented by implementing standards of medical care for his condition.

219.   Medical literature clearly states that in the presence of obstruction, bacteria settle in place, multiply and produce infectious process.

220.   Treatment with antibiotics will most of the time NOT resolve the infection.

221.   If obstructive uropathy due to prostate hypertrophy had been corrected, it would have been less likely that this patient would have suffered five episodes of C-UTI with associated complications (sepsis, septic shock, renal insufficiency).

222.   As a result of his multiple hospital admissions, the patient suffered pneumonia, severe decubitus ulcers with secondary infection, sacral osteomyelitis, infection with multiple resistant bacteria secondary to prolonged antibiotic treatment, septic shock, electrolyte imbalance, malnutrition.

223.   All these complications gradually wasted the patient, reducing his chances of recovery and leading to his eventual death.

224.   Dr. Mendez waited too long to perform surgery and resolve urinary tract obstruction.

225.   The advent of medical treatment for symptomatic prostatic hypertrophy with 5-alpha reductase inhibitors and alpha-adrenergic blockers has reduced



substantially the need for immediate surgical intervention in symptomatic prostate obstruction; however, alpha blockers do not modify prostate growth and the use of finasteride or dutasteride often fails to prevent recurrent urinary symptoms of BPH and retention.

226.   In Mr. Zayas's case, he was not a candidate for medical treatment because of his poor compliance to medical treatment.

227.   The criteria of the Second International Consultation on Benign Prostatic Hypertrophy for primary surgical management of BPH are:

   a.   Refractory urinary retention

   b.   Recurrent UTI due to prostatic hypertrophy

   c.   Recurrent gross hematuria

   d.   Renal insufficiency secondary to obstruction

   e.   Bladder calculi

   f.   Permanently damaged or weakened bladders

   g.   Large bladder diverticula that do not empty well secondary to enlarged prostate

228.   Mr. Zayas had the first four criteria.

229.   For reasons not explained in medical record, Mr. Zayas had three different primary physicians in charge of his treatment during this admission.

   a.   They were Dr. Miguel Rodriguez Soberal, Dr. Ivan Irizarry and Dr. Pedro Granados.

230.   Although it has been very difficult to understand their handwriting, the records seem devoid of assessments in their progress notes addressing the issue of the



21

urinary tract obstruction due to BPH, which was the direct cause of Mr. Zayas's multiple urinary tract infections and associated complications.

231.   After the third admission, the patient remained outside of the hospital setting for eight months.

232.   He could very well have undergone the needed surgery, but there is no evidence of any kind of urologic follow up to address this issue.

233.   This led to his fourth admission on October 19, 2012, with another episode of C-UTI at San Francisco Hospital where Klebsiella and Proteus were isolated in urine.

234.   He was given parenteral antibiotic and was discharged nine days later.

235.   No urologic evaluation was done.

236.   Mr. Zayas's last admission was at Doctors' Hospital on November 10, 2012, with Klebsiella and Enterococci UTI.

237.   Mr. Zayas died eight days later.

238.   Medical records document that Mr. Zayas remained since his third admission with pyuria and hematuria until his death.

239.   This was in spite of parenteral antibiotic treatment.

240.   Klebsiella persisted in his urinary tract for the last year of his life, probably as a result of altered urinary tract anatomy.

241.   Bacteria may proliferate in any place where anatomy is altered, any area where obstruction is present, any place where a foreign body exists.

242.   This is the perfect setting for recurrence of infection and development of antibiotic resistance as was the case with Mr. Zayas.

243. There was a clear indication for surgery to correct urinary tract obstruction and Dr. Mendez was aware that the patient was noncompliant with medical treatment and would not cooperate to do preadmission because of his dementia.

244. The only chance he had for surgery was during his multiple hospital stays.

245. The multiple primary physicians who took charge of the patient's admissions were also responsible in making sure urinary obstruction could be resolved to prevent further episodes of infection with its associated complications in an elderly man.

246. They should have attempted contact with a urologist and, as a team, generated a plan of action for effective treatment. There is no evidence of this.

247. If Dr. Mendez was unwilling to perform surgery, another urologist should have been consulted to resolve the situation.

248. This needed to be done early enough before clinical status deteriorated to a point in which the patient would have been unable to tolerate the surgical procedure.

249. Dr. Rexie Navarro failed to consult a urologist during Mr. Zayas's second admission.

250. He had evidence of left-sided hydronephrosis secondary to BPH and still he sent patient "home" without attempting resolution of problem.

251. He had to know it was a matter of time before patient would come with another infectious process, risking his life.

252. This is a breach of the standard of care.

253. Primary physicians Dr. Miguel Rodriguez Soberal, Dr. Ivan Irizarry and Dr. Pedro Granados failed to recognize the etiology of the patient's multiple episodes of

urosepsis and the need to insist on correction of urinary tract obstruction to give Mr. Zayas the opportunity of recovery and have a better quality of life.

254. Dr. Freddy Mendez failed to perform surgery on time to correct obstruction and significantly reduce chances of recurrence of urosepsis and associated morbidities.

255. He failed to give the needed follow up of his patient while admitted for urosepsis in the first and third admissions when he was consulted by primary physician.

256. This fact did not allow Dr. Mendez to reassess the case and make appropriate recommendations, including surgical procedure to resolve GU tract obstruction.

## V. <u>Damages</u>

257. All above paragraphs are herein incorporated by reference.

258. All defendants are jointly and severally liable to plaintiff Elsa Zayas.

259. As a result of the tortious acts and omissions of the defendants, plaintiff Elsa Zayas (the daughter of Mr. Zayas) has suffered, is suffering, and will continue to suffer severe damages.

260. The physical and mental pain and suffering inflicted on Mr. Zayas before, at, and after his death caused his daughter, Elsa Zayas, deep pain and anguish.

261. Elsa Zayas suffered before her father died, as she was deeply distraught and troubled by the pain, suffering, and inconvenience wrought upon him.

262. Elsa Zayas suffered due to her father's death, has continued to suffer since, and will continue to suffer due to the loss of her beloved father. This has caused her, and will continue to cause her, severe pain and anguish.



263.   The just compensation for Elsa Zayas's pain and anguish is estimated at no less than one million dollars ($1,000,000.00).

264.   Elsa Zayas incurred from September 2011 to November 2011 the following expenses:

    a.   Transportation expenses: $28,868.69

    b.   Food expenses: $8,841.85

    c.   Housing and living expenses (from October 2011 to November 2012): $22,335.42

    d.   Pet care while Mrs. Zayas was in Puerto Rico tending to the needs of her father: $17,068.19

    e.   Office items and stationary: $659.90

265.   The following expenses, incurred by Mrs. Zayas on behalf of Mr. Zayas:

    a.   Healthcare and personal care: $11,912.84

    b.   Nursing homes: $23,965.50

    c.   Funeral expenses: $18,570.29

## VI.   **Statute of Limitations**

266.   All above paragraphs are herein incorporated by reference.

267.   The plaintiff found out about the fault and/or negligence of the rest of the defendants upon receiving an expert report from infectious disease specialist Dr. Nilda I. Hernandez. Her preliminary report was received on November 6, 2013, and her second report was received on July 10, 2014.

268.   Before receiving the report, and upon a suspicion that her father might have been a victim of medical malpractice, Mrs. Zayas sent a series of tolling letters.



269. On September 4, 2012, a tolling letter was sent to Hospital General Menonita, Inc., which was received on September 7, 2012.

270. On September 4, 2012, a tolling letter was sent to Dr. Miguel Rodriguez Soberal, which was received on September 10, 2012.

271. On September 12, 2012, a tolling letter was sent to Dr. Rexie Navarro, which was received on September 17, 2012.

272. On August 12, 2013, a tolling letter was sent to Dr. Rexie Navarro, which was received on August 22, 2013.

273. On August 12, 2013, a tolling letter was sent to Dr. Miguel Rodriguez Soberal, which was received on August 14, 2013.

274. August 12, 2013, a tolling letter was sent to Hospital General Menonita, Inc., which was received on August 13, 2013.

275. On July 18, 2014, a tolling letter was sent to Dr. Rexie Navarro, which was received on August 1, 2014.

276. On July 18, 2014, a tolling letter was sent to Dr. Miguel Rodriguez Soberal, which was received on July 21, 2014.

277. On July 18, 2014, a tolling letter was sent to Hospital General Menonita, Inc., which was received on July 22, 2014.

## VII.   Jury Demand

278. All above paragraphs are herein incorporated by reference.

279. Plaintiff Elsa Zayas demands trial by jury.

## VIII.   Joint and Several Liability

280. All above paragraphs are herein incorporated by reference.

281. All defendants are jointly and severally liable to plaintiff Elsa Zayas.

**WHEREFORE**, plaintiff Elsa Zayas requests entry of judgment in her favor and against the defendants (jointly and severally), as follows:

a.   No less than one million dollars ($1,000,000) for past, present, and future pain and suffering.

b.   One hundred thirty two thousand two hundred twenty two dollars and sixty eight cents ($132,222.68) for economic damages.

c.   Prejudgment interest.

d.   Attorneys' fees.

e.   Taxable costs.

f.   Such other relief as the Court deems just and proper under the law.

San Juan, Puerto Rico, on October 3, 2014.

s/Jorge Miguel Suro Ballester
JORGE MIGUEL SURO BALLESTER
USDC-PR 121713
Email: jm@surolawoffice.com
jmsurolaw@gmail.com

s/Miguel A. Suro Carrasco
MIGUEL A. SURO CARRASCO
USDC-PR 227807
Email: masc@surolawoffice.com
miguel.suro@gmail.com

**Suro & Suro**
Attorneys for the plaintiffs
1225 Ponce de León Ave., PH-2
San Juan, PR  00907-3921
Tels.  (787) 724-5522/5542
Fax. (787) 722-7711